Argued and submitted April 2, 1986, reversed and remanded April 7, 1987

# COOS COUNTY,
*Petitioner on Review,*

*v.*

# STATE OF OREGON,
*Respondent on Review.*

(TC 82-2384; CA A31234; SC S32355)

734 P2d 1348

John K. Knight, County Counsel, Coquille, argued the cause and filed the petition for petitioner on review.

Linda J. DeVries Grimms, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

CAMPBELL, J.

## CAMPBELL, J.

In this case we are asked to resolve the respective interests of Coos County and the State of Oregon in a tract of forest property. The county sued to eject the state from the land, claiming title as the result of its foreclosure of a tax lien in 1935. The state responds with arguments challenging the county's capacity to bring this action against the state, seeking an equitable estoppel against the county's assertion of title, claiming title to the property by adverse possession, and asserting a right to restitution in the amount of the property's increase in value during the state's stewardship. The trial court quieted title to the tract in the state, holding that, though the county possessed the capacity to bring an action in ejectment against the state to defend its interests in tax-foreclosed realty, the county was equitably estopped in this instance from asserting its title against the state.[1] The Court of Appeals affirmed the trial court. *Coos County v. State of Oregon,* 75 Or App 615, 707 P2d 1243 (1985). We affirm the courts below on the issue of the county's capacity to bring this action but reverse on the issue of equitable estoppel. Because of our resolution of these and the other issues presented in this review, we remand the cause to the trial court.

The events that culminated in this controversy began nearly six decades ago. On July 31, 1930, Robert E. and Eula Richards mortgaged a 640-acre parcel of land identified as Section 34, Township 26 South, Range 12 West of the Willamette Meridian (hereinafter "Section 34") to the World War Veterans' State Aid Commission (WWVSAC) to secure a loan. The mortgage was recorded on August 7, 1930. No taxes were delinquent at that time.

In 1930 Coos County levied $69.68 in *ad valorem* taxes plus $22.40 in forest patrol assessments against Section 34. The forest patrol assessments were being collected for the Oregon Department of Forestry. The lien for those taxes attached March 1, 1930 - before the July 31 mortgage. These taxes and assessments were never paid.

On or about April 16, 1935, Coos County filed a tax

---

[1] The circuit court decided the case under a pretrial stipulation and order in which the parties submitted their issues of law and a single contested issue of fact, discussed *infra* at 176.

foreclosure suit against Section 34 and other properties. The complaint recited that a certificate of delinquency had been filed by the sheriff, as tax collector, with the county clerk for the delinquent taxes for the years 1927 to 1930, including the 1930 assessments on Section 34, but no such certificate was found on the record. The trial court in this case concluded as a matter of fact that the certificate was filed. The complaint named WWVSAC as a party defendant, and a copy of the complaint and summons was served upon WWVSAC. WWVSAC did not respond to the summons.

On September 17, 1935, the Coos County Circuit Court issued a judgment of foreclosure on the properties. Between October 5 and 11, 1935, the Coos County Sheriff held a sale of the foreclosed real estate, including Section 34. Because no bids were offered on that Section, it was awarded by default to the county for $111.44, the amount of unpaid taxes and forest patrol assessments for 1930, including penalties and interest. The sheriff's deed of the property to the county was properly recorded on April 6, 1936. However, this transfer was not reflected in the assessment or tax records of Coos County, so that taxes and forest patrol fees continued to be assessed to the Richardses between 1936 and 1940.

On December 30, 1940, the Richardses deeded Section 34 to the state in consideration of their release from the $6,000 WWVSAC mortgage. The state recorded this deed on January 9, 1941. A satisfaction of mortgage was executed on January 7, 1941, and recorded on January 14, 1941. An abstract of the title provided at that time to the state revealed the sheriff's deed of the land to the county. The state took possession of the property December 30, 1940. The county assessor's records were changed to reflect state ownership of the land. Since that time, the state has paid annual forest patrol assessments totalling $4,651.58 and has incurred administrative and management expenses of at least $33,210.00.[2] The value of Section 34 increased from an alleged value of less than $1,000 in the 1930s to approximately $2.6 million in 1981. About $2.35 million of the current value is ascribable to timber and young growth.

---

[2] The State Land Board assumed management of WWVSAC properties in 1943 and acquired its assets in 1952.

In 1982 the state agreed with a private company to a land exchange involving Section 34. That company conducted a title search which disclosed the county's tax title. The state requested a quitclaim deed from the county to clear the title. The county refused and requested a quitclaim deed from the state, which refused in turn. This action ensued.

## COUNTY'S CAPACITY TO SUE

We first address the state's contention that the county lacks authority to bring this action in ejectment against the state. The state bases its argument on the assertion that "[t]he county is part of state government, the state's agent, with no legally distinct interests," and that "[t]he title to the land arising out of a deed of foreclosure for delinquent taxes is vested nominally in the county in its capacity as the political agent of the state." Consequently, in the state's view, a dispute between the state and a county regarding tax-foreclosed lands is not justiciable. The state further insists that, even if the county possesses the capacity to bring the action, the state has not waived its sovereign immunity to an action in ejectment brought against it by a county. The Court of Appeals held that the county was capable of maintaining this action against the state. 75 Or App at 623. We agree.

This court recently discussed the nature of the county/state relationship as it pertains to county-owned lands in *Tillamook County v. State of Oregon,* 302 Or 404, 415-16, 730 P2d 1214 (1986):

"The State asserts that the counties are 'mere instrumentalities' of the state. We need not address, as a broad proposition, the relationship of counties to the state. With regard to the narrow issue of county management of county lands, the statutes dispose of the question. *Under existing statutes, counties act independently of the state with respect to management of county lands.* The legislature has granted counties various powers to manage and dispose of forest land acquired by tax foreclosure or otherwise. Counties have power to sell such land while keeping it on the tax roll, ORS 275.090, 275.110; to manage the land as a county forest, ORS 275.320; to convey the land to another governmental body for consideration, ORS 275.070; and to convey the land to the state 'in consideration of the payment to such county of the percentage of the revenue derived from such lands as provided in ORS 530.110.' ORS 530.030(1).

"Counties have been given broad powers with respect to their tax-foreclosed lands. *See* ORS 203.035, ORS chs 271 and 275. Title to such lands is in the county, not the state. ORS 275.020. The county has the power to convey such lands 'as the county governing body may deem to be for the best interests of the county.' ORS 275.070.

"Counties hold and assert their interest in county lands as corporate bodies. Counties have existed in corporate form with the power to sue and be sued since before statehood. ORS 203.010, originally enacted in 1854, General Laws of Oregon, chapter IX, § 1, p 672 (Deady 1845-1864), provides:

'Each county is a body politic and corporate for the following purposes:

'(1) To sue and be sued;

'(2) To purchase and hold for the use of the county lands lying within its own limits and any personal estate;

'(3) To make all necessary contracts; and

'(4) To do all other necessary acts in relation to the property and concern of the county.'

*"Under these statutes counties possess interests that may be asserted against the state."* (Emphasis supplied.)

■ In *Tillamook,* we held that a county's statutory entitlement to a percentage of revenue derived from land transferred to the state pursuant to ORS 530.030(1) was one such interest, and that it could be asserted through a declaratory judgment action. We now hold that a county's claim of right to possession of tax-foreclosed real property is another such interest, and that it may be asserted against the state through an ejectment action under ORS 105.005.

ORS 105.005 reads:

"Any person who has a legal estate in real property and a present right to the possession thereof, may recover possession of the property, with damages for withholding possession, by an action at law. The action shall be commenced against the person in the actual possession of the property at the time, or if the property is not in the actual possession of anyone, then against the person acting as the owner thereof."

The term "any person," specifying who may bring the action, includes artificial as well as natural persons. *State v. Dunaway,* 63 Or 555, 558, 128 P 853 (1912). The authority granted

by ORS 203.010 to sue and to perform "all other necessary acts in relation to the property * * * of the county" provides a county with the capacity to initiate actions under ORS 105.005 to assert its possessory interest, acquired through a tax lien foreclosure, in real property.

The state has waived its immunity to suits brought to determine title to real property. ORS 30.360.[3] The statute expresses the state's consent to be named a defendant and to have "its rights or interests adjudicated" in "any suit * * * involving the title to real property where the state or a state agency has record title to contested real property." ORS 30.360(2). The state argues that, because this statute does not by its terms authorize a suit by a county, a county may not institute such a suit. We agree with the Court of Appeals that the phrase "any suit," as it is used in this statute, contemplates an action brought by any party with the capacity to sue in ejectment. As we stated above, the legislature has granted the county that capacity.

A number of statutes define the interests of a county in its tax-foreclosed properties and set out the means by which title may be transferred to the state. In addition to the types of conveyances described in *Tillamook, supra,* a county may donate land to the state, ORS 275.070, surrender to the state title to any land not needed for a public purpose, ORS 271.330, or engage in an exchange of lands with the state, ORS 275.100. The state cannot compel these transfers; the county initiates them. We agree with the Court of Appeals' statement that:

---

[3] ORS 30.360 reads:

"(1) In any suit, action or proceeding brought in any circuit court of this state, affecting the title to real property on which the state or a state agency has, or claims to have, a lien, other than a suit, action or proceeding to foreclose tax liens or special improvement liens, the state may be made a party defendant, and its right or interests adjudicated. When property has been or is acquired in the name of the state upon which there are valid, unpaid special improvement liens at the time of the acquisition, the state may be made a party defendant in a suit to foreclose the lien.

"(2) In any suit, action or proceeding brought in any circuit court of this state involving the title to real property where the state or a state agency has record title to contested real property, the state may be made a party defendant, and its rights or interests adjudicated.

"(3) In no event shall any money judgment be rendered or recovery made against the state in any suit, action or proceeding brought under the provisions of this section."

"[i]f we were to hold that the county could not maintain this action, the state would have unfettered license to do as it pleases with county property, and the counties could not be heard to complain. That result would fly in the face of the legislative grant of broad powers to counties over matters of county concern, ORS 203.010 and 203.035, and its policy that the county's title to real property acquired by foreclosure of tax liens 'have the utmost stability.' ORS 312.214."

*Coos County v. State of Oregon, supra,* 75 Or App at 623-24.

The state, through the legislature, has waived its immunity to suits involving contested title to real property. ORS 30.360. The state has empowered the counties to bring suit to defend their title to real property. ORS 203.010. The state has enacted a complex statutory scheme that establishes the legally distinct interests of the county and the state in tax-foreclosed land, the procedures which must be followed to transfer title from one entity to the other, and the rights and responsibilities which result from such a transfer. In short, the legislature has established the counties' judicially protectable ownership interests in tax-foreclosed lands, and has provided the counties with the capacity and the means to assert those interests, even against the state.

## EQUITABLE ESTOPPEL AGAINST COOS COUNTY

The state next contends that the county should be estopped from asserting its ownership interests in Section 34 as a consequence of representations of state ownership allegedly made by the county over the past 40-plus years. The state relies upon the doctrine of "equitable estoppel," also called "estoppel by conduct" or "estoppel *in pais.*"

"This doctrine of equitable estoppel or estoppel *in pais* is that a person may be precluded by his act or conduct, or silence when it was his duty to speak, from asserting a right which he otherwise would have had."

*Marshall v. Wilson,* 175 Or 506, 518, 154 P2d 547 (1944).

The elements of equitable estoppel in Oregon were set out by this court in *Oregon v. Portland Gen. Elec. Co.,* 52 Or 502, 528, 95 P 722 (1908):

"To constitute estoppel by conduct there must (1) be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the

truth; (4) it must have been made with the intention that it should be acted upon by the other party; (5) the other party must have been induced to act upon it: Bigelow, Estoppel (5 ed.), 569, 570."

Courts generally have held that the misrepresentation must be one of existing material fact, and not of intention, nor may it be a conclusion from facts or a conclusion of law. Everest and Strode, The Law of Estoppel 251 (3d ed 1923). The party seeking estoppel must demonstrate not only reliance, but a right to rely upon the representation of the estopped party. *Marshall v. Wilson, supra.* Reliance is not justified where a party has knowledge to the contrary of the fact or representation allegedly relied upon. *Willis v. Stager,* 257 Or 608, 619, 481 P2d 78 (1971). The facts creating an estoppel must be proved by a preponderance of the evidence. *McKinney v. Hindman,* 86 Or 545, 551, 169 P2d 93 (1917).

We have recognized that an estoppel may be raised against government entities, subject to certain specific limitations. In *Wiggins v. Barrett & Associates, Inc.,* 295 Or 679, 692, 669 P2d 1132 (1983), we noted:

"The modern trend is to apply the doctrines of apparent authority or estoppel, or both, to prevent unjust enrichment and to accord fairness to those who bargain with the agents of municipalities for the promises of the municipalities." (Citations omitted.)

The state here contends that for over 40 years the county engaged in a continuing representation that the state owned Section 34, that the county did so with full knowledge (either actual or constructive) of the fact of its own tax lien foreclosure, and that the state, though also possessing both actual and constructive knowledge of the sheriff's deed to the county, was unaware of the "truth" of the county's assertion of superior title. In reliance upon these representations, the state incurred expenses in managing the property.

"Estoppel requires a representation to the person claiming detrimental reliance." *Thones v. Tatro,* 270 Or 775, 789, 529 P2d 912 (1974). Unless the county made some representation to the state, the county cannot be estopped from asserting its interest in Section 34. A representation can take the form of an affirmative statement or action, or, under some circumstances, of a misleading silence. For the reasons stated

below, we hold that the county's "affirmative acts" allegedly relied upon by the state did not constitute a "representation" upon which the state was entitled to rely, and that the state was not entitled in this instance to rely upon the county's silence. Consequently, the county is not estopped from asserting against the state whatever interests it may have acquired as a result of the foreclosure of its tax lien on Section 34.

The state does not contend that this is a case of estoppel by failure to disclose a claim of title. *E.g., Willis v. Stager,* 257 Or 608, 481 P2d 78 (1971). In addition to the constructive knowledge imputed to the state under ORS 93.710(1), the state admits to having had actual knowledge of the sheriff's deed as the result of an abstract of the title furnished to the state when it accepted the deed in lieu of foreclosure from the Richardses. Instead, the state maintains that for over 40 years the county has engaged in conduct constituting an affirmative representation of state ownership of Section 34. The acts that the state purports to have relied upon are the county's recordation over the past 40 years of various documents reflecting the state's transactions regarding Section 34 and the county's assessment and collection from the state of forest patrol levies on Section 34. The state asserts that these affirmative acts by the county, made by county employes within the scope of their statutory authority, are sufficient to bind the county. Combined with the county's acquiescence in the state's assertion of ownership since 1940, these acts create a representation of state ownership that the county cannot now be heard to deny. The trial court and the Court of Appeals agreed with the state. We disagree.

The county clerk's acceptance and recordation of the sundry leases and grants of easements and rights of way that the state has entered into with respect to Section 34 "represent" nothing save the clerk's recognition of a statutorily imposed obligation to so accept and record. ORS 205.130(2)(a). Establishing the probable validity of documents presented for recordation and ascertaining their effect upon the county's claims to real property are not duties within the scope of the clerk's responsibility or authority. The county's recordation of documents does not constitute a representation by the county concerning the condition of the county's title to real property.

The forest patrol assessments charged to the state are of a somewhat different character. These assessments resulted from an apparent failure to enter the fact of the county's foreclosure of Section 34 on the county tax roll at the time the foreclosure occurred. Neither party presented evidence identifying the person responsible for this failure. It is, however, the assessor's obligation to ascertain, from the best information available, who owns each parcel of real property in the county for the purpose of assessing property taxes. ORS 308.215. The "best information" for determining ownership of land in a county is, generally speaking, the real property records of that county. While it is the assessor's duty to put the name of the record owner on the tax roll, *Guthrie v. Haun,* 159 Or 50, 58, 76 P2d 292 (1938), the statutes defining the assessor's duties "do not expect him, so we believe, to display the skill and thoroughness employed by a competent title searcher," *Knapp v. Josephine County,* 192 Or 327, 354, 235 P2d 564 (1951). The legislature has recognized that the assessor will occasionally err in his or her determination of ownership of a piece of land. ORS 308.240(2) provides in part:

> "* * * If the property is correctly described, no assessment shall be invalidated by * * * the entry of a name other than that of the true owner. * * *."

According to the weight of authority, the erroneous levy and collection of taxes on property will not estop a government body from asserting title to the property assessed. 10 McQuillin, Municipal Corporations 186, § 28.56 (rev 3d ed 1981). *E.g., Kunkel v. Griffith,* 325 Mo 392, 29 SW2d 64 (1930); *City of Mount Vernon v. N.Y., N.H. & Hartford R.R. Co.,* 232 NY 309, 133 NE 900 (1922). *But see, e.g., Simplot v. Dubuque,* 49 Iowa 630 (1878); *Scotts Bluff County v. Hughes,* 202 Neb 551, 276 NW2d 206 (1979).

> "The reason for the rule is that the officers charged with the duty of assessing property and collecting the taxes thereon are without authority to convey public property, and what they cannot do directly they cannot do by indirection."

*Middleton v. Commonwealth,* 200 Ky 237, 240-41, 254 SW 754 (1923). This court has adopted this rule as it pertains to estoppel of municipalities in street dedication cases. *City of Clatskanie v. McDonald,* 85 Or 670, 674, 167 P 560 (1917).

This court considered the extent to which a tax

assessment can operate to estop a county's assertion of an interest in real property in *County of Lincoln v. Fischer,* 216 Or 421, 339 P2d 1084 (1959). There the county had sold a parcel of tax-foreclosed realty to a private party under a land sale contract. The purchaser then sold his contract rights to a third party. None of the installment payments on the contract was made. Because of this delinquency, the county court issued an order that purported to cancel the contract. Service of this order was not executed as required by statute, however, and neither the original vendee nor the third party purchaser was made aware of the order for several years. In addition, the court failed to direct the assessor to change the tax roll to reflect the order, and taxes continued to be assessed to and paid by the third party purchaser. When the county later brought suit to quiet its title in the realty, defendants argued that the county should be estopped from asserting forfeiture of the contract. Among the acts allegedly relied upon by defendants were the continued assessment and collection of taxes. This court stated:

> "In viewing the conduct of the county that enters into such an estoppel, the fact that some of the acts that must be considered were those of the tax collector constitutes no objection. A tax collector generally has no power to affect the title to land owned by the county. It is a familiar rule that a principal is bound by the acts of his agents acting within the scope of their authority; and it seems from *Glen Cullen Realty Co. v. Multnomah County,* [181 Or 394, 182 P2d 366 (1947)], and *Feehely v. Rogers,* [159 Or 361, 76 P2d 287, 80 P2d 717 (1938)], that this rule applies to the county when acting in matters such as those now before us as well as it does to private parties. In addition, the county judge clearly has the power to convey land, and it was through his failure to direct the tax collector to remove Spaulding from the tax rolls that both Fischer and Spaulding were misled. Thus, not only the acceptance of the tax payments but also the lax treatment accorded Fischer in meeting his obligations may be attributed directly to the county officers who have the power to affect the title to the county's land."

216 Or at 452-53.

The cases cited in the preceding passage addressed some of the consequences arising from a county's sale of land to a private party. In *Feehely v. Rogers, supra,* this court was

asked to determine whether a county acted in its governmental capacity when negotiating a land sale contract, and whether it had the authority to include in such a contract provisions not specifically authorized by statute. This court held that "when the county court sold the land to the plaintiff, negotiated the written contract, and supervised its performance, it was acting as the fiscal, financial or managing agent of the county," and that "all contracts made by the county courts while acting in that capacity are to be interpreted the same as contracts of individuals." 159 Or at 371. In *Glen Cullen Realty, supra,* this court held that a county was not acting in its governmental capacity when it negotiated a land sale contract with a private party, and so might be estopped to deny the authority of a particular county official to execute such a contract where the county had clothed him with apparent authority to do so. 181 Or at 405.

■■ We conclude from *County of Lincoln v. Fischer* and the cases cited therein that, in Oregon, an erroneous tax assessment on real property will contribute to the estoppel of a county to assert an interest in that property where (1) the party seeking the estoppel acquired the land from the county or is in privity with one who did, and (2) responsibility for the assessment can be ascribed to an officer possessing authority to affect the county's title to land. This rule reflects the "modern trend," noted in *Wiggins v. Barrett & Associates, Inc., supra,* toward permitting the use of estoppel to accord fairness to those who bargain with public entities, and it recognizes that representations made by county officers with the requisite authority to estop the county may be manifested to the "representee" only in the form of a tax assessment. The state has not alleged nor has it shown that it has directly dealt with any county official regarding Section 34, or that any county officer with the necessary authority to convey title to county land either contributed to the failure to record the county's interest on the tax roll, or performed any other act or omission upon which the state was entitled to rely. *Cf. County of Lincoln v. Fischer, supra.* Consequently, the county is not estopped by its erroneous collection of forest patrol assessments.

We must next determine whether the county's inaction constituted a misrepresentation justifying an estoppel in this instance. This court has held that a government body's "tacit acquiescence" to an assertion of dominion over public

lands by a private party will not estop the government body from later asserting its interest in those lands. *City of Molalla v. Coover,* 192 Or 233, 235 P2d 142 (1951). The state argues that the *Coover* rule is inapplicable in a dispute between government bodies. The state reasons that because the policy underlying the courts' reluctance to find an estoppel against a public body is a desire to protect the "public interest," and that because, in a dispute between two government entities, both represent this interest, limitations upon the applicability of estoppel against public bodies should not apply in such a case. Regardless of the merit of this reasoning, the attempt to apply it to this case misapprehends the rationale behind *Coover.*

*Coover* reconsiders the line of cases that began with *Schooling v. Harrisburg,* 42 Or 494, 71 P 605 (1903). In *Schooling,* the owners of a tract of land adjoining the city of Harrisburg had the land surveyed into blocks, lots, alleys and streets and in 1871 recorded a plat of the land as an addition to the city. They then conveyed lots in the addition with reference to the recorded plat, though the Harrisburg city council had failed to accept the dedication. In 1876, one of the owners conveyed to the Schoolings portions of adjoining blocks in the addition along with, by quitclaim, that part of the platted street separating those blocks. The Schoolings proceeded to cultivate and fence the platted streets, and to set out grape vines and fruit trees. They built a barn that extended across a platted alley. In 1901, the Harrisburg city council sought to open the addition. The Schoolings argued that the city should be equitably estopped from opening the streets. This court agreed, stating:

> "* * * the officers of the defendant knew that the streets and alley in question were inclosed, and must also have known that plaintiff, for more than twenty-five years, had been making valuable improvements thereon, and, these officers having permitted him to use the property without objection in a manner inconsistent with the assertion of any right thereto on the part of the city, such tacit permission and use evidence an abandonment of the highway by the municipality, which operates to estop it from asserting the right now insisted upon * * *."

42 Or at 500.

This court cited *Schooling v. Harrisburg* with

approval in a number of subsequent street dedication cases, though it does not appear that the doctrine of estoppel by acquiescence was determinative in any of those cases. *See City of Molalla v. Coover,* 192 Or at 243-48.

Some 48 years after *Schooling v. Harrisburg,* this court reconsidered the doctrine of estoppel by acquiescence in *Coover.* An addition to the city of Molalla had been platted and recorded in 1913. The county court vacated a portion of the plat south of Seventh Street in 1930. Defendants in 1931 purchased some of the land thus vacated that lay immediately south of an unvacated street. In 1937 they purchased a lot on the other side of the unimproved and unopened part of the street. In 1940 they built a barn in the street. Nine years later the Molalla city council ordered the street opened. Defendants raised the defense of equitable estoppel. The court noted:

> "There were no affirmative representations made to the defendants concerning the existence or location of [the street] or the erection or maintenance of the barn on which the defendants could have relied or did rely. The defendants' case rests upon the claim that the city is estopped by reason of its long-continued tacit acquiescence in the occupation and fencing of the street and the erection and maintenance since 1940 of the barn."

192 Or at 238-39.

The court acknowledged that a city has a duty "to prevent the erection or maintenance of unauthorized permanent and valuable obstructions in dedicated streets, of which obstructions they may have notice." *Id.* at 240. After extensively reviewing the cases in which estoppel by acquiescence had been used or approved, the court noted:

> "On the other hand, when a city which had constructed an unauthorized sewer on the plaintiff's land claimed that he should be estopped by his passive acquiescence, this Court said:
>
> " '* * * Mere silence, or, in the language of previous judicial opinions, "passive acquiescence," does not by itself create an irrevocable license or produce an estoppel: * * *.' *Fraser v. Portland,* 81 Or 92, 158 P 514.
>
> "It would seem that a governmental body should be, in general, as immune from estoppel as a private litigant."

192 Or at 248-49.

Because estoppel by acquiescence would not be available against a private litigant, and because the courts historically have recognized limitations on the use of estoppel against public bodies to prevent public forfeiture, the court determined that estoppel by acquiescence should not be available for use against a municipality where the party seeking to invoke it possessed knowledge of the city's interest in the land, or where that interest was easily ascertainable.

> "The doctrine of *Schooling v. Harrisburg* is a product of the pioneer era. It is ill-adapted to the needs of progressive and growing cities. In so far as that case and the dicta which have approved it stand for the proposition that a city will be estopped to open a street by reason of its tacit acquiescence in the construction therein of permanent and valuable improvements by persons who knew or should have known that the erections were within the lines of dedicated though unopened streets, it and they are overruled. The plaintiff in the Schooling case knew that his improvements were in the street. The fact that he took a quitclaim deed to property which his grantor could not convey might have given color of title but did not give color of equity."

192 Or 252-53.

*Coover* does not impose a special limitation upon the use of equitable estoppel against the government. It reflects instead this court's recognition that the pre-*Coover* cases approving estoppel by "tacit acquiescence" rendered government bodies more susceptible than private parties to estoppel. The court sought to conform the rules regarding the availability of estoppel against a public body to those defining its availability against private parties. *Coover* did not hold that a county's silence could never form the basis of an estoppel, but that silence could not estop a county where it would not estop a private party.[4]

---

[4] The state contends that the applicability of the *Coover* rule is limited to street dedication cases, and that the court intended to limit the holding to the particular facts of the case. 192 Or at 253. We note that the rule of estoppel by tacit acquiescence originated in a street dedication case and was apparently utilized by this court only in such cases. The state here seeks to extend the pre-*Coover* rule to tax-foreclosed county lands. When the court in *Coover* limited the holding to its facts, it did so to avoid addressing the question whether estoppel might be imposed where the city had made affirmative representations concerning ownership of the land. *Id.*

This court has held that silence will create an estoppel only where there is a legal duty to speak. *Waterway Terminals v. P.S. Lord*, 242 Or 1, 24, 406 P2d 556 (1965). Regarding land, such a duty is most frequently found to arise where the owner stands by while an innocent party is persuaded to make some expenditure with respect to the land.

> "It is as true in law as consonant with reason, that he who remains silent when he should have spoken, and permits his property to be dealt with by a stranger as his own, is estopped from asserting that right to the damage of another, when the latter, from his silence, might fairly infer that he had no interest in the thing."

*Fahie v. Pressley*, 2 Or 23, 27 (1861).

■ Here, no such duty arose. The state was not innocent of knowledge concerning the county's claim to Section 34. The county's interest was a matter of public record. The state had notice, both constructive and actual, of that interest. It is the duty of the representee to use some manner of protection and precaution to safeguard his interests. *Bradford v. Western Oldsmobile*, 222 Or 440, 444, 353 P2d 232 (1960). This notice imposed at the very least a duty upon the state to inquire. *See generally City of Newberg v. Kienle*, 60 Or 486, 493, 120 P 3 (1912).

> "If, at the time when he acted, such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment."

Pomeroy, 3 Pomeroy's Equity Jurisprudence 219, § 810 (5th ed 1941). *See also City of Molalla v. Coover, supra,* 192 Or at 253.

■ The county is under no obligation periodically to reaffirm its record ownership of realty, nor is it duty-bound to patrol its lands and eject interlopers with notice of the county's interest on pain of surrendering title.[5] Had the

---

[5] The state seems to imply that the statutory scheme of ORS chapter 275 imposes upon the county a duty to prevent interlopers from entering county owned land and exploiting that land for their own purposes, and that this "duty to speak" will support an estoppel by silent acquiescence. Because such a duty, if it exists, arises for the benefit of the county's residents, not that of the interloper, the interloper cannot rely upon it to establish an estoppel. To justify an estoppel by silence, the duty to speak must arise for the protection of the innocent party - to forestall that party's detrimental reliance upon the silence.

county elected to speak, it could have done little more than direct the state's attention to the sheriff's deed of which the state was already aware. The state and the county had equal knowledge of the facts.[6] The county's silence in this instance could not, or should not, have misled the state. No estoppel arose.

## ADVERSE POSSESSION AGAINST COOS COUNTY

The state next contends that it is entitled to ownership by adverse possession of Section 34. The state maintains that it has exercised continuous, hostile, exclusive, open dominion over the parcel for the statutory period under a claim of right. The county responds that the state is foreclosed from claiming title through adverse possession by ORS 275.027, which reads:

> "The rights of any county to public lands are not extinguished by adverse possession. No title or property rights to public lands shall be acquired against the county through operation of a statute of limitations."

This statute seems unambiguous, but the state has raised two arguments against its applicability in this instance: (1) that as a statute of general applicability "[i]t was never intended to diminish the sovereignty of the State of Oregon," relying upon *State Land Board v. Campbell,* 140 Or 196, 13 P2d 346 (1932), and (2) that because the purpose of the statute is to prevent public ownership of land from being defeated by the negligence of public officers, it is inapplicable where the purpose of asserting adverse possession is to assure continued

---

[6] We note, too, that the state does not seek equity from this court with the cleanest of hands. The state had several opportunities to resolve this situation at an early date. In 1935 the state received notice, in the form of a summons, of the Richardses' tax delinquency. Though it was not amenable to the foreclosure suit, the state might then have exercised its authority under 3 Oregon Code Annotated (1930) § 66.113 to pay the delinquent taxes and extinguish the county's lien. It elected instead to ignore the notice and permit the county to foreclose that lien. Seeking satisfaction of its mortgage in 1940, the state might have foreclosed the mortgage and had its interest in the land adjudicated. It elected instead to accept an ineffective deed in lieu of foreclosure and to file a satisfaction of the mortgage. Upon discovering the sheriff's deed favoring the county, the state might have inquired of the county and requested a quitclaim deed or taken other action. It elected instead to disregard the county's record interest without inquiry and take possession of Section 34: Where the equities are equal, the law shall prevail, and the law in this instance recognizes the county's duly recorded sheriff's deed.

public ownership, albeit in the hands of the state rather than the county.

The state's argument that ORS 275.027 effects a restraint upon sovereign authority and is thus inapplicable in this instance misapprehends the nature of the doctrine of adverse possession. Acquisition of title by adverse possession is based upon the running of the statute of limitations for bringing an action to recover real property.

ORS 12.050 reads:

> "An action for the recovery of real property, or for the recovery of the possession thereof, shall be commenced within 10 years. No action shall be maintained for such recovery unless it appear that the plaintiff, an ancestor, predecessor, or grantor was seized or possessed of the premises in question within 10 years before the commencement of the action."

ORS 12.250 reads:

> "Unless otherwise made applicable thereto, the limitations prescribed in this chapter shall not apply to actions brought in the name of the state, or any county, or other public corporation therein, or for its benefit."

The statute of limitations focuses not upon the actions (or the identity) of the adverse possessor, but upon the inaction of the record owner; not upon the rights gained by the adverse possessor, but upon rights lost to the record owner by the running of the statute. Satisfying the elements of "adverse possession" is a condition necessary to running the statute of limitations but not sufficient to vest title where the statute does not apply. Consequently, ORS 12.250 and ORS 275.027 are properly viewed not as limiting the ability of adverse possessors to acquire title to county lands, but as removing an impediment to the county's ability to defend its record title to real property.

We recently approved Tiffany's explanation of the operation of the statute:

> "Ordinarily at least, the statutes of limitations with reference to land in terms impose no requirement upon the person in wrongful possession as to the character of his possession necessary to make the bar effective, and it is merely by reason of the endeavor of the courts adequately to protect the interests of the rightful owner that certain requirements in this

regard have become established. The most important of these requirements is that to the effect that the possession must be hostile or 'adverse' to the true owner, and so generally has this requirement been recognized, and so important has it been regarded, that the expression 'adverse possession' has come to be generally applied to describe that branch of the law which has to do with the construction and application of the statutes of limitation in reference to land. The emphasis thus laid upon the character of the wrongful possession has the unfortunate effect of obscuring the theory on which, as above stated, these statutes appear properly to operate, that is, that, *like other statutes of limitation, they bar the remedy of the person rightfully entitled not by reason of any merit in the wrongdoer, but by reason of the demerit of the person who, having a remedy, fails to exercise it within the time named in the statute.*"

4 Tiffany, Real Property 699, § 1135 (3d ed 1975), *quoted in Evans v. Hogue,* 296 Or 745, 754-55 n 5, 681 P2d 1133 (1984). (Emphasis supplied.)

 The state can acquire title to real property by adversely possessing the land for the statutory period. *Stephenson v. Van Blokland,* 60 Or 247, 118 P 1026 (1911). However, the state's "sovereign authority" argument fails because the ability to acquire title by adverse possession, as opposed to immunity from adverse possession, is not an incident of sovereignty. A limitation upon the availability of adverse possession is not a limitation upon a sovereign prerogative. The state, like a private party, can obtain title to land through adverse possession, but its ability to do so is defined by the relevant statutes, and that ability, absent a specific statutory exception, is no greater than that of any private party. *Accord Ostrander v. Bell,* 199 App Div 304, 192 NYS 262, 267, *aff'd* 234 NY 566, 138 NE 449 (1922); *Williams v. North Carolina State Board of Education,* 266 NC 761, 147 SE2d 381, 385 (1966); *State v. Vanderkoppel,* 45 Wyo 432, 19 P2d 955, 957 (1933). ORS 275.027 bars the doctrine's use, without exception, against county-owned public land. ORS 12.250 frees a county from the restrictions imposed upon ejectment actions by ORS 12.050, again without exception. The state's possession of Section 34, however "adverse," has not rendered the county's title indefensible, and so has not vested title in the state.

The state's "public ownership" argument is equally unpersuasive. That a statute's nonenforcement in a particular

situation will conform to its purpose as well as will its enforcement is not a sufficient rationale for holding the statute inapplicable in that situation. Also, ORS 275.027 and ORS 12.250 do not protect "public ownership" as an abstract good. The specific "public interest" served by removing the impediment of ORS 12.050 in this instance is that of the residents of Coos County, who are entitled to the same degree of protection against forfeitures caused by the errors and negligent inaction of their officers regardless of the identity of the opposing party. While it is true that state ownership of Section 34 would inure to the benefit of Coos County residents as well as to that of the other citizens of Oregon, the benefit would be vastly attenuated in comparison to that derived from direct county ownership of the property.

## THE STATE'S MORTGAGE INTEREST AND ENTITLEMENT TO RESTITUTION

■ We next consider the effect of the county's tax lien foreclosure upon the interests of the previous owners - the Richardses -. and of the state. We conclude that while the proceedings were effective to foreclose the Richardses' interest in Section 34, because the state had not consented to have its lien interests in land adjudicated in such proceedings, they did not extinguish the state's mortgage interest. Consequently, the county took title to Section 34 subject to the state's mortgage interest in the land, and the later deed purporting to convey the Richardses' interest to the state conveyed nothing.

■ Where the state has not consented to be named a party defendant in a foreclosure proceeding, the courts are powerless to adjudicate the state's lien interest in realty in such a suit. *Federal Land Bank v. Schermerhorn*, 155 Or 533, 64 P2d 1337 (1937). The state argues that it had not consented to have its interests in land adjudicated in tax foreclosure actions and that the county's foreclosure was therefore ineffective to extinguish the state's mortgage. We agree. The statutes in effect at the time of the county's foreclosure of its lien do not evince an intent on the state's part to consent to the adjudication of its interests in a tax foreclosure proceeding; we therefore conclude that the county's foreclosure was ineffective to extinguish the state's mortgage interest.[7]

---

[7] Dicta from this court's opinion in *State Land Board v. Schroetlin*, 161 Or 146, 88

■■ ■■ Though the county's foreclosure of its tax lien was ineffective to foreclose the state's mortgage, it was effective to extinguish the Richardses' interest.[8] When the county took title to Section 34 as the result of the sheriff's sale in October 1935, that title was subject to the state's mortgage interest. Because the Richardses' ownership interest ended with the county's foreclosure of its tax lien, the deed accepted in lieu of foreclosure by the state was ineffective to transfer an interest in Section 34. The satisfaction of mortgage filed by the state did not necessarily extinguish the state's mortgage interest, however. Because the deed accepted by the state conveyed no interest in Section 34, the satisfaction was unsupported by consideration. In addition, it does not appear that permitting the state to revoke the satisfaction at this time will prejudice the rights or interests of any party. *Holzmeyer v. Van Doren,* 172 Or 176, 139 P2d 778 (1943). Consequently, we hold that the state's mortgage lien against Section 34 survived the pur-

---

P2d 316 (1939), slightly complicates this issue. In that case the court was asked to ascertain the relative priorities of a county's property tax lien and a State Land Board mortgage. This court determined:

"* * * that, where a tax has been levied and is delinquent at the time the State Land Board accepts a mortgage upon the lands so taxed, the lien of the tax is superior to the lien of the mortage subsequently taken, but where taxes are later imposed after the giving of a mortgage upon lands covered by the mortgage, the tax lien is inferior to the mortgage lien and, until the mortgage is paid in full, the mortgage has priority over the tax lien as to all moneys received from the sale of the property under foreclosure proceedings brought to enforce payment of the mortgage."

161 Or at 151.

Here the county's tax lien arose before the state's mortgage interest. Our opinion in *Schroetlin* and the institution of the action from which it arose occurred after the enactment in 1937 of what is now ORS 30.360(1), n 3 *supra*. That statute specifically withholds the state's consent to have its lien interests in realty adjudicated in tax foreclosure proceedings. *Schroetlin* thus cannot be read as inferring the state's implied consent to suit from other statutory provisions. *Cf. Umatilla County v. Bowman,* 155 Or 49, 62 P2d 266 (1936). In addition, because the tax liens in *Schroetlin* had all arisen after the State Land Board mortgage was taken, the "prior in time, prior in right" implications of the case's holding were dicta.

[8]The state has argued (less vigorously to this court than to the courts below) that the county's foreclosure was ineffective not only against the state's mortgage interest, but against the Richardses' title interest as well, so that the deed accepted by the state in lieu of foreclosure effectively conveyed to the state ownership of Section 34. The state premises this argument on the provisions of 3 Oregon Code Annotated (1930) § 66.113, which authorized the WWVSAC to, among other things, "accept deeds from borrowers in lieu of foreclosure." The state contends that insofar as the county's foreclosure purported to extinguish the Richardses' interest, it impinged upon the state's sovereign prerogative to accept a deed in satisfaction of its mortgage from the Richardses at the state's election rather than institute foreclosure. This argument is

ported satisfaction. Because the state is not bound by the presumption of satisfaction prescribed by ORS 88.110, *State Land Board v. Lee,* 84 Or 431, 165 P 372 (1917), it is free to seek satisfaction of its lien.

The state argues that if title to Section 34 is quieted in the county, the state is entitled to restitution of the increased value of Section 34 attributable to the state's management of the land. "The allowance of a recovery from the owner for the value of improvements mistakenly put on the owner's premises is an application of the equitable rule which prevents unjust enrichment." *Comer v. Roberts,* 252 Or 189, 193, 448 P2d 543 (1968). Restitution is available to persons who in good faith erect improvements on land they mistakenly believe to be theirs, though the owner has not sought the aid of equity or requested a judgment against the improvers. *Id.* It is not necessary that the landowner be the source of the mistake. *McKay v. Horseshoe Lake Hop Harvesters, Inc.,* 260 Or 612, 491 P2d 1180 (1971). The mistake may be one concerning the legal effect of a deed, and notice of the true owner's adverse claim to the realty does not vitiate the improver's entitlement to restitution so long as the improvements were made under a good faith belief in the legitimacy of the improver's claim. *Sugarman v. Olsen,* 254 Or 385, 459 P2d 545 (1969). In this instance the state seems to have acted under the good faith belief that the deed accepted from the Richardses conveyed good title to Section 34, despite the county's earlier tax foreclosure. Under Oregon's law the state is consequently entitled to restitution of the value of its improvements on Section 34.

> "This court has held that where the improvements are removable equity requires that the occupant be required to remove them. *Brumbaugh v. Ashton,* 108 Or 521, 302 P2d 1018 (1956). * * *. Where the occupant is entitled to compensation for his improvements, and the owner is not guilty of inequitable conduct, equity dictates that the owner be given his option whether he pays for the increase in the value of his property which was brought about by the improvements or whether he receives the value of the land upon which the improvements have been made." (Citations omitted.)

without merit. The statute enabled WWVSAC to accept deeds in lieu of foreclosure; it did not guarantee the effect of such deeds. Though the county's tax foreclosure did not affect the state's lien, it did extinguish the Richardses' interest. The state could (and did) still accept the deed from the Richardses, but that deed conveyed only the interest that the Richardses possessed at the time of the conveyance.

*Comer v. Roberts, supra,* 252 Or at 193-94.

The improver cannot obtain reimbursement for his costs, only for the enhancement of market value resulting from the improvements. *McKay v. Horseshoe Lake Hop Harvesters, Inc., supra,* 260 Or at 617. The state has presented no evidence as to the exact nature and value of any "improvements" as opposed to the portion of the increased value of Section 34 resulting from economic and botanic forces operating independently of the state's efforts. On remand the state may present such evidence.

The decision of the Court of Appeals that Coos County is equitably estopped from asserting its title to Section 34 is reversed. The decree is reversed and the cause is remanded to the trial court for an order declaring Coos County the owner in fee simple of Section 34, and for further proceedings on the issue of restitution.