Argued and submitted May 22, 1997, reversed and remanded February 4, petition for review denied July 14, 1998 (327 Or 431)

Lynn MEIER,
Assignee of Benjamin and Hannah Jones,
*Appellant,*

*v.*

Clyde RIEGER
and Bonnie Rieger, Dan Bunn and Richard Reed,
*Respondents.*

(95-0808; CA A93808)

954 P2d 786

James M. Brown argued the cause for appellant. With him on the briefs were Nicole M. Hendricks and Enfield Brown & Collins.

Melvin T. Rollema argued the cause and filed the brief for respondents Clyde Rieger and Bonnie Rieger. Robert T. Willis joined in the brief for respondents Dan Bunn and Richard Reed.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LANDAU, J.

**LANDAU, J.**

In this action to quiet title to real property, the parties dispute ownership of a sliver of land on the border between their two parcels. Plaintiff contends that she and her predecessors enclosed the disputed land with a fence and treated it as their own for a sufficient period of time to have acquired it by adverse possession. Defendants contend that they were aware of the fence and gave permission—albeit not explicitly—to plaintiff and her predecessors to use the land and that, as a result, plaintiff cannot claim acquisition by adverse possession. In the alternative, defendants contend that plaintiff should be estopped from claiming that she has acquired the land by adverse possession. The trial court found for defendants. On *de novo* review, ORS 19.415(3), we conclude that there is clear and convincing evidence that plaintiff satisfied all the requisite elements of her adverse possession claim and that there is no basis for estopping her from asserting it. We therefore reverse.

The parties own several adjacent parcels of rural land in Linn County located immediately south of Highway 226. Beginning at the west end, there is lot 501, which was purchased by Hannah and Ben Jones in 1978. To the east of lot 501 is lot 601, which was purchased by Ellis and Amanda Sabin in 1979. The next lot to the east is lot 602, which was purchased originally by the Sabins in 1980 and sold to defendants in 1985. Finally, to the east of lot 602 is lot 700, which the Joneses purchased in 1974 and sold to plaintiff in 1995. The boundary between lots 501 and 601, running north and south, was marked by a fence at the time that the Joneses and the Sabins purchased the two lots. The fence, however, did not track precisely the record title boundary. Beginning at the north end of the boundary, the fence gradually veered slightly to the west, so that the fence lay approximately 25 feet to the west of the true boundary at the point that it met the southern end of the parcel. Similarly, the boundary between lots 602 and 700 was marked by a fence at the time that the Sabins and Joneses purchased the lots. And, true to the sort of coincidences found only in real life and litigation, the fence did not track precisely the location of the record title boundary. That fence, too, gradually veered slightly to the

west, so that it lay approximately 25 feet to the west of the true boundary at the southernmost point of the properties. A graphic illustration of the location of the four parcels—not to scale—is as follows:[1]

```
501          | 601       602        | 700
             |                      |
             |                      |
  Fence      |             Fence    |
     ↳       |                ↳     |
             |                      |
```

The dispute in this case is about the narrow triangle of property between the fence and the true boundary between lots 602 and 700.

The record does not reflect when either of the fences originally was constructed. It does show that, by the time the Joneses purchased lot 700, in 1974, the fence running between lots 602 and 700 was very old and in a state of substantial disrepair. The Joneses repaired the fence, over time replacing deteriorated cedar posts with iron ones. They understood that they had purchased the property "fence to fence" and believed that any property to the west of the fence was theirs. The Joneses posted "no trespassing" and "no hunting" signs on the fence and replaced those signs when they deteriorated or succumbed to vandalism. Meanwhile, the Joneses used the property to graze cows and sheep.

In 1980, Ellis Sabin informed Hannah Jones that a recent survey of the boundaries of the parties' properties showed that both the fence between lots 501 and 601 and the fence between lots 602 and 700 veered to the west of the true boundaries. They examined the west fence, between lots 501

---

[1] The creation of the illustration—in fact, our understanding of the facts of the case in general—was hampered by a lack of exhibits. The briefs on appeal contained no drawings or maps. And the record from the trial court, which contained only plaintiff's exhibits (defendants apparently declined to provide their trial exhibits upon request of this court), did not include a map showing the location of all four parcels. We encourage parties to make use of illustrations and graphic exhibits in cases such as this, where an accurate understanding of the physical location of property and other items is so important.

and 601 and agreed that the fence needed repairs. Sabin then proposed that both fences be readjusted to reflect the proper boundaries. He suggested that the west fence be readjusted first, because it was in immediate need of repairs, and that the east side fence, between lots 602 and 700, could be readjusted at some indefinite time in the future. Hannah Jones did not agree entirely. According to Ellis Sabin's own recollection of their conversation, she agreed to adjust the west fence, but not the east fence:

"Q. So did she agree—Well, did she tell you what she would do?

"A. She acted as if—said that this was fine on [the west] side. And I told her, I says, 'You know,' I says, 'you're going to be gaining some footage.'

"Q. You're referring to the move from west to east?

"A. Yes.

"Q. Between 501 and 601?

"A. Mm-hmm.

"Q. Did she understand that?

"A. Yes, she did.

"Q. Did you also point out to her that there would be a corresponding loss on the east side?

"A. Well, I told [her], 'Let's go over and take a look at the stake on the east side,' and showed her the stake. And I said, 'You'll be losing 20, 22 feet, maybe a little bit over, on that side.'

"Q. And what happened next?

"A. Well, she walked away. *She never said whether she would do this or not.*"

Amanda Sabin, who was present at the conversation, confirms that Hannah Jones did not agree to move the east fence, between lots 602 and 700, that she simply turned around and walked away and that by doing so, Hannah Jones communicated that "there was no way, by her actions, that she was about to change that fence on the east side." The Sabins and Hannah Jones had additional discussions about the east fence "now and then," but she "didn't want to agree

that the surveying stake was where it was." According to Amanda Sabin, "[i]t was okay to talk about the west side, but it wasn't okay to talk about the east side."

Meanwhile, Hannah Jones moved and repaired at least a portion of the west fence, between lots 501 and 601.[2] She also continued to maintain the east fence, including the "no trespassing" and "no hunting" signs that she regularly posted on the fence. In 1985, when defendants purchased lot 602 from the Sabins, they were informed of the fact that the east fence did not track the boundary line and was in need of repair. The record, however, reflects no action or conversations about the east fence until 1995, when defendants informed Hannah Jones that they intended to move and repair the fence.

The Joneses initiated this action, and, during the pendency of the matter before the trial court, plaintiff purchased lot 700 from the Joneses and was substituted for them. After trial, the court issued an opinion letter, which stated, in pertinent part:

"I am not convinced by clear and convincing evidence that the elements of adverse possession have been proven. Judgment is for defendant.

"Although I need not make factual findings, I do believe that Mrs. Jones had a conversation with Mr. Sabin shortly after the 1979 survey. I also believe, contrary to her testimony, that both property line markers were identified and that a discussion did occur concerning moving the fences. Although Mrs. Jones may not have agreed or acquiesced, it was more than coincidental that the fence was built on the property line between lots 501 and 601. The elements of estoppel have been proven as well."

On appeal, plaintiff argues that the trial court erred in concluding that she failed to demonstrate the elements of adverse possession by clear and convincing evidence. According to plaintiff, the record stands unrebutted that she and the Joneses maintained the east fence for well in excess of the

---

[2] Apparently, Hannah Jones relocated the southern portion of the fence to align correctly with the boundary. She left a "middle" section of the fence at its "incorrect" location.

requisite ten-year period, that they did so openly and hostilely, in the face of a contrary claim by defendants and their predecessors. Defendants contend that "[w]hat is missing in Plaintiff's case is the element of hostility or adversity." According to defendants, the Joneses used the disputed strip of property with their permission. They point to no evidence of express permission, but instead argue that their permission was implicit in their failure to take action against the Joneses. Defendants argue that they did not need to take any action, because they had clearly informed Hannah Jones of the mistaken location of both the west and east fences.

■      To establish title by adverse possession, a party must show clear and convincing proof of actual, open, notorious, exclusive, continuous and hostile possession of the property for a ten-year period.[3] *Thompson v. Scott*, 270 Or 542, 546, 528 P2d 509 (1974); *Shoeller v. Kulawiak*, 118 Or App 524, 528, 848 P2d 619, *rev den* 317 Or 272 (1993). In this case, no one disputes that plaintiff and her predecessors, the Joneses, actually, openly and notoriously possessed the disputed portion of fenced land on the border between lots 602 and 700 and that they exercised exclusive use of that land continuously for more than ten years. The parties do dispute whether plaintiff and the Joneses used the property in a manner than may be characterized as "hostile."

■■      If it is demonstrated that the disputed property was used openly and continuously for the requisite ten-year period, hostility is presumed. *Nice v. Priday*, 137 Or App 620, 625, 905 P2d 252 (1995), *rev den* 322 P2d 644 (1996). To rebut the presumption, there must be evidence either that the use was permissive or that the use did not interfere with the other parties' use of the property. *House v. Hager*, 130 Or App 646, 651, 883 P2d 261, *rev den* 320 Or 492 (1994). In this case, no one contests that, by fencing off the disputed strip of land, plaintiff and the Joneses interfered with the use of the land

---

[3] Under plaintiff's theory, her interest—or more accurately, the interest of her predecessors—vested before the enactment of ORS 105.620, and, therefore, that statute is inapplicable. *Davis v. Parke*, 135 Or App 283, 286 n 1, 898 P2d 804, *rev den* 321 Or 560 (1995).

by defendants and their predecessors. The only issue, then, is whether there is evidence that the use was permissive.

■■ To establish that the use of property was permissive, more than acquiescence in the use must be shown. *See Feldman v. Knapp*, 196 Or 453, 472, 250 P2d 92 (1952) ("Evidence of mere acquiescence in, as distinguished from permission for, such use on the part of the owners of the servient estate is insufficient[.]"); *House*, 130 Or App at 651 ("uncommunicated acquiescence" held insufficient to rebut the presumption). In this case, there is no evidence of any permission communicated to either plaintiff or the Joneses. To the contrary, the evidence shows that, at least from 1980, Hannah Jones declared her right to fence the disputed property, that she disputed the location of the boundary stakes and that she refused to move the east fence.

Defendants insist that their permission should be inferred from the fact that they understood that Hannah Jones eventually would move the east fence, consistent with her actions in moving the west fence to match the correct boundary between lots 501 and 601. We find that argument unavailing. To begin with, their contention that they had an understanding that Hannah Jones would move the east fence is contradicted by their own recollections of their conversations with her. Amanda Sabin, for example, recalled that "there was no way, by her actions, that [Hannah Jones] was about to change the fence on the east side." Ellis Sabin similarly recalled that Hannah Jones "never said whether she would [move the east fence] or not." Even assuming for the sake of argument that the Sabins understood that Hannah Jones had agreed implicitly to move the east fence, the fact remains that for the succeeding fifteen years she did not take any steps to do so. Instead, and directly in conflict with any understanding to the contrary, Hannah Jones openly asserted her right not to move the fence and continued both to maintain it and to post "no trespassing" and "no hunting" signs on it. Meanwhile, for fifteen years, defendants and the Sabins said nothing to her about her continued use of the disputed property and her refusal to move the fence enclosing it. On this record, we can only conclude that defendants have

failed to rebut the presumption of hostility. Plaintiff therefore established all the requisite elements of her adverse possession claim.

Defendants contend that, even if plaintiff established all the elements of her adverse possession claim, she should be estopped from prevailing. Defendants argue that it would not be fair to allow plaintiff the benefit of the west fence adjustment without requiring her to make a corresponding adjustment to the east fence and that they acted reasonably in assuming that plaintiff and her predecessors eventually would make that adjustment. Plaintiff argues that there is no evidence of the elements of estoppel that the law requires. She argues that neither she nor the Joneses made any representations that reasonably would have justified defendants sitting on their rights while the Joneses maintained the east fence without adjustment for fifteen years.

To prevail on an equitable estoppel defense, defendants must prove that plaintiff or her predecessors intentionally made a false representation with knowledge of the facts and that defendants were ignorant of the truth and were induced to rely on the false representation. *Coos County v. State of Oregon*, 303 Or 173, 180-81, 734 P2d 1348 (1987). The misrepresentation must be one of fact and not of intention. *Id.* at 181. In addition, the party seeking estoppel must prove that any reliance on a misrepresentation was justifiable. *Id.* Justifiable reliance does not exist when the party seeking estoppel has knowledge of contrary facts. *Id.*

In this case, there was no representation. Ellis Sabin testified that Hannah Jones "never said whether she would [move the east fence] or not." Defendants acknowledge the lack of any express misrepresentation and argue that one was implicit in the conduct of Hannah Jones when she moved the west fence. According to defendants, that conduct communicated her intention to move the east fence, as well. That argument, however, as we have explained in the context of the adverse possession claim, is untenable in the face of the testimony of Amanda Sabin that "there was no way, by [Hannah Jones'] actions, that she was about to change that fence on the east side." Even assuming that Hannah Jones's

act of moving the west fence implicitly communicated her intention to move the east fence, what she implicitly communicated was not a misrepresentation of fact, but of her intentions, which cannot form the basis of an equitable estoppel defense. *Coos County*, 303 Or at 181. In any event, whatever the significance of her conduct in moving the west fence, the fact remains that after that conduct, she disabused the Sabins of her intentions to move the east fence. The evidence is uncontradicted that she refused to acknowledge her obligation to move the east fence, that she disputed the location of the boundary stakes shown to her by Ellis Sabin and that she continued to maintain the fence for the next fifteen years. Under the circumstances, we conclude that defendants have failed to establish the elements of equitable estoppel.

Reversed and remanded for entry of judgment quieting title in plaintiff.