On appellant's petition for reconsideration filed November 18, and respondent Hogue Investment Corp.'s petition for reconsideration filed November 19, 1996, reconsideration allowed; opinion (144 Or App 410, 927 P2d 124 (1996)) modified in part and adhered to as modified February 19, 1997

Marion C. COOLEY,
*Plaintiff,*

*v.*

Robert Roger FREDINBURG,
*Appellant,*

Marion C. COOLEY,
as assignee of U. S. National Bank of
Oregon, a national banking association;
First Interstate Bank of Oregon, N.A.;
L. Ken Casteel; John C. Preston and Patricia J. Preston,
husband and wife;
Timotheas John Horn and Normalee D. Horn,
husband and wife;
Tischhauser, Cooper & Co., a partnership;
Frieda A. Kuttig; and Federal Deposit
Insurance Corporation, in its corporate
capacity as successor to
Bear Creek Valley Bank,
*Defendants,*

*and*

HOGUE INVESTMENT CORPORATION,
*Respondent.*

(88-0971-J-1; CA A89024)

934 P2d 505

Douglas J. Richmond for appellant's petition.

Richard D. Adams for respondent Hogue Investment Corporation's petition.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

### EDMONDS, J.

Appellant Fredinburg and respondent Hogue Investment Corporation (Hogue) separately petition for reconsideration of our decision in this case, in which we concluded that Fredinburg was entitled to judgment against Hogue in the amount of $9,837. *Cooley v. Fredinburg*, 144 Or App 410, 927 P2d 124 (1996) (*Cooley II*).[1] We grant reconsideration of both petitions, increase the amount of Fredinburg's judgment to $12,723, and otherwise adhere to our previous opinion.

We quote the facts from our previous opinion:

"Fredinburg is the owner of real property that was subject to several liens. The senior lienholder, Cooley, filed a complaint for foreclosure and joined as defendants all junior lienholders as well as Fredinburg. One of the junior lienholders was the Federal Deposit and Insurance Corporation (FDIC). Cooley's complaint requested foreclosure of all liens on the property and sought a judgment against Fredinburg for the amount owed to her. Cooley's complaint also requested that the court apply

'any proceeds of the sale * * * first toward the costs of sale, then toward satisfaction of plaintiff's judgment prayed for herein, and *any surplus to the party or parties who may establish their right thereto.*'

"Except for FDIC and one other lienholder that had assigned its interest in the property to Cooley, all of the defendants, including Fredinburg, failed to appear, and the court entered orders of default against them. FDIC eventually entered into a stipulated judgment with Cooley that foreclosed all of the parties' liens. The stipulated judgment did not reduce to judgment the debt owed to FDIC. The judgment, however, provided:

" '6.  The proceeds of sale shall be applied (a) to the costs of the sale; (b) then toward the satisfaction of plaintiff's judgment awarded in paragraph 1 above;

---

[1] In *Cooley v. Fredinburg*, 114 Or App 532, 836 P2d 162, *rev den* 315 Or 311, *cert den* 508 US 973 (1993) (*Cooley I*), we held that FDIC had no right to redeem when it failed to protect its interests under state law by obtaining a judgment of foreclosure. Hogue is the assignee of the Federal Deposit and Insurance Corporation's interests.

(c) next toward the satisfaction of defendant's Marian C. Cooley as assignee of U.S. National Bank of Oregon, judgment awarded in paragraph 3 above; and (d) the surplus, if any, to the Clerk of this Court to be disposed of by further order of this Court.'

"A third party bought the property at the foreclosure sale for more than was necessary to satisfy the judgment in favor of Cooley. As a result, the sheriff paid $14,581 as surplus proceeds to the clerk of the court. The clerk thereupon sent the surplus proceeds to Fredinburg. The trial court, upon learning of the clerk's action, sent a letter to Fredinburg demanding that Fredinburg return the money. Fredinburg did not respond to the court's letter or return the money.

"FDIC thereafter moved for an order directing that the surplus proceeds be disbursed to it. It did not serve Fredinburg with the motion. By this time, Fredinburg had redeemed the property. Pursuant to the motion, the trial court ordered 'that the Trial Court Administrator pay to the FDIC, or its assigns, the excess proceeds of Sheriff's sale in the sum of $14,581.40.' It further ruled:

" '6.   On or about June, 1990, [Fredinburg] without seeking or obtaining approval or order of this Court, wrongfully obtained from the Trial Court Administrator payment to him of the $14,581.40 in excess proceeds of sale which should properly have been subject to further order of this Court; this Court has requested of Fredinburg the prompt return of these improperly obtained funds, which request has been refused.

" '7.   The FDIC has represented to the Court that it intends to exercise an existing right to further redeem the subject property on or about February 11, 1991, during the course of which it will deposit with the Trial Court Administrator the approximate sum of $87,350, which sum would ordinarily be disbursed as a matter of course to Fredinburg as the previous redemptioner of the property.

" '* * * * *

" 'IT IS FURTHER ORDERED that the Trial Court Administrator, in the event of a further redemption of the subject property, shall recover from any future redemption funds received which would otherwise be

payable [to Fredinburg] the sum of $14,581.40, as a recovery of the excess proceeds from the original Sheriff's sale of June 14, 1990, which were previously inadvertently paid to Mr. Fredinburg without authority. That sum shall then be paid by the Trial Court Administrator to the FDIC or its assigns in accordance herewith.'

"Fredinburg received no notice of the court's order before its entry.

"Eventually, Hogue Investments, as the assignee of any interest that FDIC had in the property, gave notice of its intention to redeem the property from Fredinburg. Fredinburg objected, but the trial court concluded that Hogue was entitled to redeem the property. On appeal, we reversed, holding that the judgment of foreclosure had foreclosed FDIC's lien and that Hogue, as FDIC's assignee, lost its right to redeem the property because it had not 'established' its lien before the foreclosure. [*Cooley I*]. While that appeal was pending, Hogue remained in possession of the property, received rents from it and made improvements.

"After our decision, Fredinburg brought this action against FDIC and Hogue seeking restitution for the actual rent received from the property or the property's reasonable rental value, whichever was greater, during the time that Hogue was in possession of the property. Hogue counterclaimed, alleging that the improvements that it had made to the property while it was in possession had increased the property's fair market value and that the costs of those improvements should be offset from the rent it had received. It also alleged that Fredinburg was indebted to it for the surplus of $14,581, as determined by the previous order and that it was entitled to recover that amount from him. The trial court dismissed Fredinburg's claims for restitution against both Hogue and FDIC on the ground that the cost of Hogue's improvements was greater than the rent received. It further ruled that the earlier order had determined FDIC's entitlement to the surplus proceeds and that it was binding on Fredinburg." *Cooley II*, 144 Or App at 413-15. (Footnote omitted; emphasis supplied.)

On appeal, we reversed the trial court, concluding that Hogue could offset the expenses "necessarily incurred in [the property's] protection, "but could not offset the fair market value or cost of improvements from the rent it owed

Fredinburg. 144 Or App at 417. We also concluded that the trial court erred in holding that Fredinburg was bound by the order requiring him to return the surplus proceeds from the sheriff's sale to FDIC "or its assigns," because Fredinburg was not given notice or an opportunity to be heard regarding that order. *Id.* at 419. Accordingly, we ordered judgment to be entered in favor of Fredinburg in the amount of $9,837.

■ In its petition for reconsideration, Hogue first argues that, while we correctly held that the trial court's order that Fredinburg return the surplus monies was void for lack of notice, Hogue's entitlement to the proceeds had previously been established. It reasons:

"The trial court had jurisdiction to keep the door open in the original foreclosure judgment for the Court to later dispose of foreclosure sale proceeds by 'further order.' The Court's Opinion from which reconsideration is sought correctly acknowledges that the trial court had proper jurisdiction to enter that part of the February 4, 1991, order awarding the excess sale proceeds to FDIC because that part of the order was completely consistent with the language found in both the complaint and the foreclosure decree. No notice to Fredinburg, as a defaulted party, was required for that part of the order as he had been properly served with the original complaint, and had defaulted. * * * No part of that order was ever appealed, and it became final years ago."

Hogue's argument, as we understand it, is premised on the language in the judgment that ordered that the surplus from the sale paid to the court clerk "be disposed of by further order of this court." The judgment obtained by Cooley foreclosed all liens on the property, ordered a sale of the property and ordered that Cooley's judgment and costs be satisfied from the proceeds of the sale. Cooley's complaint did not and could not have contemplated an order requiring Fredinburg to deliver the surplus proceeds to FDIC because at that time there was no certainty that there would be a surplus or that the surplus would find its way into Fredinburg's possession. The subsequent order to that effect was made by the court without notice to Fredinburg after the sale occurred.

■ Nevertheless, Hogue contends that the portion of the subsequent order that awarded the surplus to FDIC is a valid

order because it was part of the relief contemplated by Cooley's complaint and the foreclosure judgment. We think that Hogue's argument overstates the relief that was requested by Cooley's complaint and granted by the foreclosure judgment. Contrary to Hogue's assertion, the complaint did not indicate the amount of FDIC's lien, did not request that FDIC's lien be reduced to judgment, and did not assert FDIC's interest in the proceeds of the foreclosure sale. Rather, the complaint contained only a procedural provision in the event that there are excess proceeds from the sale. It asked the court to apply any surplus proceeds "to the party or parties who *may* establish their right thereto." (Emphasis supplied.) Similarly, the judgment did nothing more than make the surplus subject to the "further order" of the court. In *Cooley II*, we relied on ORCP 67 C(1) for the proposition that a default judgment cannot award relief different from what was prayed for in the underlying pleading without additional notice to the defaulting party. We held that, because Cooley's complaint did not request that the excess proceeds of the sale be awarded to FDIC, it did not give Fredinburg notice that FDIC was claiming the surplus proceeds in that proceeding. It follows that under ORCP 67 C(1), Hogue, as FDIC's assignee, could not rely on the order as an adjudication of FDIC's entitlement to the surplus proceeds when it is considered as a supplement to the judgment.

Hogue's argument on reconsideration does not persuade us otherwise. Hogue's concession that Cooley's complaint did not request that Fredinburg deliver the surplus proceeds to FDIC does not go far enough. Contrary to Hogue's assertion, the complaint did not request an adjudication of FDIC's entitlement to the proceeds either. We adhere to the portion of our opinion in *Cooley II* that concluded that the trial court erred in determining that Hogue was entitled to the surplus proceeds and ordering Fredinburg to pay those proceeds over to him.

Hogue's second argument on reconsideration pertains to the reimbursement to Fredinburg of the rents that Hogue received while it was in possession of Fredinburg's property. In *Cooley II*, we allowed Hogue to offset the expenses incurred in protecting the property from the amount of reimbursement. However, we disallowed Hogue's

request to include in the offset amount the fair market value or costs of improvements that it had made to the property while in possession. Our ruling relied in part on language from *Lytle v. Payette-Oregon Irr. Dist.*, 175 Or 276, 152 P2d 934 (1944), that specifically refers to section 74(e) of the *Restatement of Restitution*. We stated:

> "In [*Lytle*], the court held that, when a judgment creditor purchases land at an execution sale pursuant to an erroneous judgment, the judgment debtor is entitled to complete restitution including the
>
>> " 'reasonable rental value, or the rents, issues and profits of the premises for the period during which the judgment debtor was deprived of possession.'
>
> "The court, relying on *Restatement of Restitution* § 74(e) (1937), further said that the compensation to the debtor should be offset by 'expenses necessarily incurred in its protection, and disbursements for taxes and other liens.' [*Lytle*, 175 Or at 287] (emphasis supplied). In other words, only those expenses that are necessary for the protection of the property, including costs associated with taxes and other liens, may be offset from the restitution owed the judgment debtor." *Cooley II*, 144 Or App at 415-16.

Thus, we adopted the position of section 74(e) of the *Restatement* that restitution under the circumstances of this case does not include the expense of improvements.[2]

Hogue argues that we have ignored more recent case law regarding equitable credit for improvements in which, Hogue asserts, the court "created specific Oregon exceptions"

---

[2] Section 74 of *Restatement* provides, in part:

"A person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable * * *.

"* * * * *

"(e) **Specific restitution from judgment creditor.** If the property of the judgment debtor was awarded to the judgment creditor, or if the judgment creditor purchased it upon execution sale, the judgment debtor is entitled to specific restitution, together with the value of its use in the meantime, diminished by expenses necessarily incurred in the protection of the property and the payment of taxes of liens, but not including the expense of improvements."

to section 74(e) of the *Restatement of Restitution*. In particular, Hogue points to the holdings in *Coos County v. State of Oregon*, 303 Or 173, 734 P2d 1348 (1987), and *Sugarman v. Olsen*, 254 Or 385, 459 P2d 545 (1969).

In *Coos County*, the county had foreclosed on real property for the failure to pay county taxes. At the foreclosure sale, there were no bidders, and the county purchased the property for the amount owed to it. The sale was recorded in the county deed records, but the transfer was never reflected in the county tax records. The county tax assessor continued to send tax statements to the previous owners whose interest had been foreclosed. Subsequently, the prior owners sold their interest in the property to the state of Oregon. The state held the property for approximately 30 years and made improvements to it. During that time, the value of the property increased from less than $1,000 to over $2,000,000.

Eventually, the state sought to sell the property to a third party and a title search revealed that the county owned the property. Litigation ensued over who was the rightful owner. Ultimately, the Supreme Court concluded that the county owned the property, and the issue became whether the state was entitled to restitution of the increased value attributable to its management of the land. In resolving that question, the court did not rely on the *Restatement of Restitution* or section 74. Instead, it cited the general principle that " '[t]he allowance of a recovery from the owner for the value of improvements mistakenly put on the owner's premises is an application of the equitable rule which prevents unjust enrichment.' " *Id.* at 195 (quoting *Comer v. Roberts*, 252 Or 189, 193, 448 P2d 543 (1968)). Also, the court reiterated its holding in *Sugarman* that notice of the true owner's claim does not vitiate the entitlement to restitution so long as the improvements are made in good faith. In light of those principles, the court remanded for further proceedings on the issue of restitution.

There is no mention of *Restatement of Restitution* section 74 in either *Comer* or *Sugarman*. In *Comer*, the court, referring to *Jensen v. Probert*, 174 Or 143, 148 P2d 248 (1944), rejected the early common-law rule that a true owner of real property could recover the land in ejectment without

incurring any liability to pay for improvements by an occupier even though the improvements had been placed on the property in good faith. In *Jensen*, the court relied on the general principle that when the owner under those circumstances invokes equitable relief, the owner must do equity to the occupier as a condition of relief, and it relied further on the provisions of section 42 of *Restatement of Restitution*.[3]

■ We perceive no conflict between the principle in section 74(e) that a judgment debtor should not be required to pay for unwanted improvements placed on the property by a possessor and the rule of law relied on by Hogue. Restitution is an equitable remedy, and its scope is dependent on the specific circumstances of each case. Although under both sections of the *Restatement* the possessor holds the property under a good faith claim of right, the circumstances under which the improvements are made differ significantly. In this case, the parties had obtained an adjudication of ownership that was on appeal at the time that Hogue made its improvements. Hogue was on notice that, although it had won in the trial court, there was a potential for defeat on appeal. Until there was a final legal determination as to the rightful owner, Hogue assumed the risk that it might lose ownership of the property. In cases where neither party has sought a legal determination of its rights and there are mere unlitigated claims to the property, the equities are in equipoise if the claims and improvements are made in good faith. Here, because of the pending appeal, that equipoise no longer existed when Hogue made its improvements.

■ Moreover, as the court in *Lytle* pointed out, the obligation of the possessor during the appeal's pendency is similar to that governing an accounting by a trustee under an

---

[3] That section provides, in part:

"(1) Except to the extent that the rule is changed by statute, a person who, in the mistaken belief that he or a third person on whose account he acts is the owner, has caused improvements to be made upon the land of another, is not thereby entitled to restitution from the owner for the value of such improvements; *but if his mistake was reasonable, the owner is entitled to obtain judgment in an equitable proceeding or in an action of trespass or other action for the mesne profits only on condition that he makes restitution to the extent that the land has been increased in value by such improvements, or for the value of the labor and materials employed in making such improvements, whichever is least.*" (Emphasis supplied.)

implied trust. 175 Or at 286-87. In effect, Hogue held not only its own possessory rights to the property but also rights implied by law because of the pendency of the appeal. As a result of the latter role, necessary expenditures to protect the value of the property on behalf of the rightful owner are properly offset from the revenue received from the use of the property in the event the property is returned to its rightful owner. In contrast, expenses for improvements that are not made for the benefit of the rightful owner but in anticipation of unfettered ownership implicate different equities because they may benefit only the possessor and may be unwanted by the rightful owner. All of these equities are in contrast to the equities where there is no pending litigation, and the possessor possesses the property only for its own benefit. In sum, the differences between the *Restatements* are based on different equities, and, on weighing the equities in this case, we continue to adhere to our opinion that they favor Fredinburg.

■     Hogue next argues that, even if it was not entitled to offset the fair market value of its improvements against the rents it received, we erred in concluding that its repairs of the artificial pond constituted an "improvement." It argues, "[w]hile [Hogue] concedes that the intention of putting in the road was to improve the property, the construction in connection with the pond was done to prevent a washout." We have reviewed the record in light of Hogue's contention. We can identify no discrete expenses pertaining only to the pond that would allow us to separate the construction of the pond from the road. Even if we were to agree that the construction of the pond was for the protection of the property rather than for its improvement, Hogue's argument fails for lack of evidence.

■     In his motion for reconsideration, Fredinburg asks us to reconsider that portion of our opinion that allowed Hogue to offset the expenses for a conditional use permit fee (CUP fee) and a management fee against the rents. The evidence indicates that the CUP fee authorized Hogue to rent space on the property to a commercial tenant, Taylor-Made Builders. In return for the rental space, Taylor-Made Builders made many of the repairs that were necessary to protect the property. Based on that evidence, we conclude that the CUP fee was part of the expenses necessary to protect the property and adhere to our previous decision allowing Hogue

to offset it from the rental income it received while in possession of the property.

■     As to the management fee, the evidence indicates that Hogue's majority shareholder was the property manager. One of the corporation's officers testified that the corporation never paid a management fee to the shareholder because it had a negative cash flow and that the shareholder would have been required to loan the corporation money in order to pay himself. Regardless of the corporation's reasons for not paying the fee, the fact is that it did not incur the expense. We erred in including in the offset amount a fee that Hogue never paid.

In our previous opinion, we concluded that "the necessary expenses for the protection of property totaled $25,356[.]" *Cooley II*, 144 Or App at 417. We modify our opinion by removing the management fee of $2,886 from that total. The necessary expenditures, as modified, total $22,470. Hogue received gross rent of $35,193. Therefore, the trial court should enter judgment on behalf of Fredinburg for $12,723 on remand.

Reconsideration allowed; opinion modified to increase judgment for Fredinburg to $12,723; adhered to as modified.